**STATE of Utah, Plaintiff and Appellee,**

v.

**Bojidar G. BAKALOV, Defendant and Appellant.**

No. 910649–CA.

Court of Appeals of Utah.

March 17, 1993.

Ronald S. Fujino (argued), Andrew A. Valdez, and Carlos A. Esqueda, Salt Lake City, for defendant and appellant.

Jan Graham, State Atty. Gen., Judith S.H. Atherton, Joanne C. Slotnik, Asst. Atty. Gen. (argued), Salt Lake City, for plaintiff and appellee.

Before GREENWOOD, JACKSON and ORME, JJ.

## OPINION

GREENWOOD, Judge:

Appellant, Dr. Bojidar Bakalov, appeals from his conviction of rape, a first degree felony, in violation of Utah Code Annotated section 76–5–402 (Supp.1991). Dr. Bakalov contends that the trial court violated his Constitutional right to self-representation. We remand for further proceedings.

## BACKGROUND

Dr. Bakalov was born in Varna, Bulgaria. He obtained both an M.D. and a Ph.D. and taught and practiced medicine in Bulgaria and the Soviet Union. In 1989, the American Association of Thoracic Surgery awarded Dr. Bakalov the 1990–91 "Evarts A. Graham Memorial Traveling Fellowship," which allowed him to study in the United States and to increase his contacts with North American thoracic surgeons. Award candidates were required to be "sufficiently proficient in English to realize the full benefits of the Fellowship."

Dr. Bakalov arrived in Salt Lake City in the summer of 1990 under the sponsorship of Dr. William Gay, his contact at the University of Utah Medical Center. He met the alleged victim on April 1, 1991, after he had explained to one of her friends that he needed a typist. The two met several times over the next five days to work on Dr. Bakalov's resumé. On the night of April 6, 1991, the two went for a drive in Dr. Bakalov's truck. What occurred thereafter is disputed. Dr. Bakalov claimed that they engaged in consensual sexual activity; the woman claimed that Dr. Bakalov forcibly raped her.

At his arraignment on May 17, 1991, Dr. Bakalov informed Judge Richard H. Moffat that he wished to represent himself because he did not want his "fate" affected by representation by someone other than himself. Judge Moffat denied Dr. Bakalov's request to represent himself and, over Dr. Bakalov's objections, ordered attorneys from the Salt Lake Legal Defenders Association to defend him. Judge Moffat stated:

Well, the point here is, you do not know the American legal system. You don't know and are not familiar with the procedures. You don't know the laws of the State of Utah; and you're not skilled as a lawyer.... You would be doing yourself a major disservice. You would not be able to adequately represent yourself ... I just can't, in all good conscience, Dr.[,] allow you to represent yourself in this case.

In a letter to Judge Moffat dated the next day, Dr. Bakalov again requested self-representation. He expressly requested Judge Moffat to "[s]top the authority of any atorney [sic] to represent me," remarking, "This is my second plea to withdraw all attorneys from my case."

Due to a scheduling conflict, the case was transferred to Judge Leslie A. Lewis. Dr. Bakalov once again made it clear that he wished to represent himself. In a letter to Judge Lewis dated May 21, 1991, Dr. Bakalov stated, "I want to represent myself." He also stated, "I cancel all the power of my public defenders to represent me."

At a hearing on May 24, 1991, Judge Lewis denied Dr. Bakalov's request, ruling from the bench as follows:

Defendant's motion to represent himself is denied. The court specifically finds the Legal Defenders Association represented the Defendant at a preliminary hearing, knows the facts of the case, is prepared to proceed and is willing to proceed. Further, the court finds the Defendant's best interests would not be served by self-representation since the defendant could not effectively represent himself due to communication problems, a lack of knowledge about even the basics of the laws and the American legal system, Defendant's inability to meet with and meaningfully prepare for trial while in jail.

Dr. Bakalov renewed his request to proceed without legal counsel at the scheduling conference on July 2, 1991. Dr. Bakalov disclaimed the legal defender attorney as his attorney, stating, "I refuse my attorney." He also wrote a letter to Presiding Judge Michael Murphy, received July 7, 1991, requesting dismissal of his court appointed attorneys. Dr. Bakalov referred to his attorneys as "pseudoattornies" and complained that they had refused to file motions which he requested.

In his many letters, Dr. Bakalov repeated his belief that his court appointed defense attorneys were working for the State and that they intended to assist in finding him guilty in order to keep in favor with the juries. Dr. Bakalov also expressed a belief that his attorneys were cooperating with Dr. Gay in an attempt to keep Dr. Bakalov and his family from immigrating to the United States. For these reasons, Dr. Bakalov stated that he did not intend to cooperate with his court appointed attorneys.[1]

On the first day of trial, Dr. Bakalov, through his attorney, Mr. Valdez, again asked the court to dismiss both Mr. Valdez and Mr. Esqueda as his attorneys. The court denied the motion and assured Dr. Bakalov that he would be given latitude in terms of approaching the court and "essentially engaging in some self representation." In making its ruling, the court stated:

But in order to move the trial forward and protect his interests, we will go forward with Mr. Valdez and Mr. Esqueda representing him. It's the court's determination that he would not be able to knowingly and intelligently waive his right to counsel at this time. His knowledge of the American legal system, his knowledge of the American, or the English language, together with the totality of the issues that have been raised in previous motions in connection with self-

1. Dr. Bakalov's letters indicate a longstanding distrust of government and suggest that his perception of the American justice system was colored by his experiences in communist countries. For example, he noted that his grandfather had possessed information which would be very damaging to certain members of the Bulgarian government. Dr. Bakalov wrote of a belief that members of the Bulgarian government were attempting to keep him from publishing his grandfather's information. While this reaction may be viewed as paranoid in the United States, perhaps it was merely realistic in Bulgaria.

representation have been carefully considered by the court, and at this time, we will move forward with Mr. Valdez and Mr. Esqueda representing the defendant.

Following a three day bench trial, Judge Lewis found Dr. Bakalov guilty of rape and sentenced him to five years to life in the Utah State Prison. Dr. Bakalov subsequently appealed, asserting that the trial court had violated his right to self-representation under the United States and Utah Constitutions.

## ANALYSIS

### Right to Self–Representation

The right to defend oneself in a criminal prosecution is well established under the Sixth Amendment to the United States Constitution. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta*, the United States Supreme Court held that the Sixth Amendment implicitly guarantees the right of a competent defendant to represent herself or himself in state criminal actions. *Id.* at 834–36, 95 S.Ct. at 2541. The Court found that this right must be protected in harmony with the Sixth Amendment's guarantee to the assistance of counsel. *Id.* at 834, 95 S.Ct. at 2540.

The *Faretta* Court detailed the long history of Anglo–American criminal jurisprudence sanctioning self-representation. The opinion noted the only tribunal that had required a competent defendant to have counsel in a criminal proceeding was the infamous Star Chamber.[2] *Id.* at 821, 95 S.Ct. at 2534. When the English abolished the Star Chamber in 1641, "[t]he notion of obligatory counsel disappeared with it." *Id.* at 823, 95 S.Ct. at 2535.

Self-representation continued as a common practice in the early colonies. While most of the colonies allowed representation by counsel, most colonists distrusted lawyers. Thus, the documents establishing the right to counsel provided that the accused could plead through a lawyer or represent himself or herself. *Id.* at 828, 95 S.Ct. at 2538. In no instances did a colonial court require a defendant in a criminal case to accept an unwanted lawyer. *Id.* at 828, 95 S.Ct. at 2537.

The *Faretta* Court also scrutinized the interaction between a criminal defendant and his or her attorney, in recognizing the right of self-representation. The Court noted that while an attorney is usually beneficial to an accused, the "potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly" if the representation is against the defendant's wishes. *Id.* at 834, 95 S.Ct. at 2540. "To force a lawyer on a defendant can only lead him to believe that the law contrives against him." *Id.* Because the right to defend oneself is a personal right and the defendant ultimately bears the consequences of a conviction, the defendant "must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834, 95 S.Ct. at 2540–41 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan J., concurring)). For these reasons, the Court concluded that a state could not prevent a competent defendant from representing himself or herself. *Id.*

The right of self-representation is not unique to the Sixth Amendment. The Utah Constitution also specifically guarantees the right of an accused to "defend in person and by counsel." Utah Const. art. 1, § 12. As early as 1954, the Utah Supreme Court reversed a second degree murder conviction, holding that under the Utah Constitution, "[t]he right to defend in person certainly should not be denied an accused in a situation where he must either choose to use it or proceed with counsel in whom he has lost confidence." *State v. Penderville*, 2 Utah 2d 281, 272 P.2d 195,

---

**2.** Counsel practicing before the Star Chamber had to be cautious as they could be fined or imprisoned if their pleadings unduly offended the Crown. *Id.* at 822 n. 18, 95 S.Ct. at 2534 n. 18.

199 (Utah 1954).[3] Utah's rules of criminal procedure also provide that "[a] defendant charged with a public offense [has] . . . the right to represent himself." Utah R.Crim. P. 8.

Inasmuch as the exercise of the right of self-representation necessarily constitutes a waiver of the right to counsel, trial courts have the duty to determine that a defendant has knowingly and intelligently chosen self-representation. *State v. Drobel*, 815 P.2d 724, 733–36 (Utah App.), *cert. denied*, 836 P.2d 1383 (Utah 1991); *see also Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. The decision must also be voluntary. *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987). Whether the decision is voluntary and has been made knowingly and intelligently "turns upon the particular facts and circumstances surrounding each case." *Id.* at 188.

Consideration of the defendant's best interests is not relevant to the determination of whether or not a knowing and intelligent waiver has been made. *Drobel*, 815 P.2d at 733 n. 16. If the defendant's best interests were the standard, the trial courts would rarely permit self-representation, for it is almost always in a defendant's interest to have counsel. *See Faretta*, 422 U.S. at 834, 95 S.Ct. at 2540. The standard, rather, is whether the defendant, with adequate intelligence and knowledge about the potential ramifications, voluntarily chooses self-representation. *Frampton*, 737 P.2d at 187.

When making this decision, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). As the Utah Supreme Court noted in *Frampton*:

Generally, this information can only be elicited after penetrating questioning by

the trial court. Therefore, a colloquy on the record between the court and the accused is the preferred method of ascertaining the validity of a waiver because it insures that defendants understand the risks of self-representation. Moreover, it is the most efficient means by which appeals may be limited.

*Frampton*, 737 P.2d at 187. In *Frampton*, the court quoted a sample colloquy used by the federal courts. *Id.* at 187–88 n. 12 (discussing the Bench Book for United States District Court Judges, Vol. 1 §§ 1.02–2 to –5 (Federal Judicial Center, 3d ed. 1986)). The focus of the federal colloquy is not on the defendant's technical knowledge of the law. *Id.* A defendant's technical knowledge of the law is irrelevant to the court's assessment of a knowing exercise of the right of self-representation. *Faretta*, 422 U.S. at 836, 95 S.Ct. at 2541. Instead, the colloquy focuses on whether the defendant understands what he or she is giving up by choosing self-representation. *Frampton*, 737 P.2d at 187–88 n. 12. The federal court guide addresses

whether defendant has studied law; defendant's experience at self-representation; the charges and possible penalties faced; familiarity with, and the expectation of adherence to, procedural and evidentiary rules; a warning that the trial court will not direct or advise the defense; a recommendation against self-representation; and whether the choice of self-representation is voluntary.

*Drobel*, 815 P.2d at 732 (discussing *Frampton*, 737 P.2d at 187–88 n. 12). If the defendant states that he or she understands the disadvantages of self-representation and that the decision is voluntary, the federal Bench Book recommends that self-representation be permitted. *Frampton*, 737 P.2d at 188 n. 12. While this colloquy is not mandatory, it provides a helpful framework for the trial courts. *Drobel*, 815 P.2d at 732; *see also State v. Hamilton*, 732 P.2d 505, 507 (Utah 1986) (properly allowing self-representation where colloquy indicated defendant "under-

---

3. Counsel has not provided a separate analysis under the Utah Constitution. Our analysis, therefore, does not differentiate between the state and federal constitutions.

stood risks of declining legal counsel, was aware of the legal ramifications and technical rules applicable to his case, and knew that" he could not adequately defend by just telling his story).

 The court should also consider any information of record concerning a defendant's mental health which may relate to whether he or she can knowingly and intelligently choose self-representation. *Drobel*, 815 P.2d at 734. In *Drobel*, the trial court considered such information in conjunction with defendant's responses to a colloquy substantially similar to the federal colloquy. *Id.* at 734–35. The trial court's decision to allow defendant to represent himself was affirmed, despite some concerns about defendant's mental health, because the defendant had responded appropriately to the court's questions and mental health experts had opined that defendant possessed an intact cognitive capacity. *Id.* at 735. The *Drobel* court noted that symptoms indicating mental illness do not "necessarily render [defendant] incapable of knowingly and intelligently choosing to represent himself." *Id.*[4]

 This precedent leads us to conclude that unless a trial court appropriately finds that a defendant has not knowingly and intelligently chosen self-representation, it must honor that defendant's choice. The right to defend oneself is a personal, constitutional right, which a court should only deny if it finds that the waiver of the right to counsel was not made "knowingly and intelligently." *Faretta*, 422 U.S. at 834–35, 95 S.Ct. at 2540–41.

Some courts have held that if the trial court fails to create an adequate record demonstrating (1) that the court explored the defendant's capacity to select self-representation; and (2) a factual basis for finding defendant did not knowingly and intelligently opt self-representation, the appropriate remedy is to reverse and remand for a new trial. *Schafer v. State*, 459 So.2d 1138, 1139 (Fla.App.1984); *State v. Watkins*, 25 Wash.App. 358, 606 P.2d 1237, 1239 (1980). A new trial may likewise be necessary when the trial court has applied an erroneous standard of law in formulating its findings of fact. *Townsend v. Sain*, 372 U.S. 293, 315–16 & n. 10, 83 S.Ct. 745, 758 & n. 10, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, —— U.S. ——, ——, 112 S.Ct. 1715, 1717, 118 L.Ed.2d 318 (1992); *see also Acton v. Deliran*, 737 P.2d 996, 999 (Utah 1987) ("findings of fact must show that the [trial] court's judgment . . . 'follows logically from and is supported by, the evidence' "). Moreover, a court's wrongful denial of self-representation cannot be construed as harmless error. *McKaskle v. Wiggins*, 465 U.S. 168, 177–78 n. 8, 104 S.Ct. 944, 950–51 n. 8, 79 L.Ed.2d 122 (1984); *see also Arizona v. Fulminante*, —— U.S. ——, ——, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991).

### Standard of Review

 The trial court's factual findings regarding whether the defendant knowingly and intelligently waived the right to counsel will not be overturned unless they are clearly erroneous. *See Drobel*, 815 P.2d at 734. However, this court will apply a correction of error standard to determine whether the trial court applied the proper legal standard in reaching its decision to deny self-representation. *State v. Palmer*, 803 P.2d 1249, 1251 (Utah App.1990) ("in assessing the trial court's legal conclusions based on its factual findings, we afford it no deference but apply a 'correction of error standard' "), *cert. denied*, 815 P.2d 241 (Utah 1991).

### Application

 Dr. Bakalov argues that the trial court improperly denied his constitutional

---

**4.** In *Moran v. Godinez*, 972 F.2d 263, 266–67 (9th Cir.), *cert. granted*, —— U.S. ——, 113 S.Ct. 810, 121 L.Ed.2d 683 (1992), the court discussed the distinction between competency to waive counsel or plead guilty and competency to stand trial. The court concluded that competency to waive the right to counsel, as a constitutional right, "requires a higher level of mental functioning than that required to stand trial." A defendant may elect to self-represent if "he has the capacity for 'reasoned choice' among the alternatives available to him," but may be competent to stand trial "if he merely has a rational and factual understanding of the proceedings and is capable of assisting his counsel." *Id.*

right to self-representation. First, Dr. Bakalov asserts the trial court erred by applying the wrong legal standard to determine whether he was entitled to conduct his own defense: Rather than determining if Dr. Bakalov made a knowing and intelligent decision, the trial court decided the issue based on its assessment of Dr. Bakalov's best interest. Second, Dr. Bakalov asserts that even if the proper standard is applied, the trial court's findings concerning his limited ability in English and his inferior knowledge of the law are insufficient to justify the refusal of his right to self-representation.

The State contends that an examination of the entire record supports the trial court's ruling. According to the State, Dr. Bakalov's understanding of the legal proceedings was so minimal that a colloquy or similar in-court proceeding would have been pointless. Having reviewed the record, we conclude that the trial court's statements do indicate application of an incorrect legal standard. Further, we are not persuaded that the court's ruling is supported by legally relevant fact findings or evidence, or that further inquiry into Dr. Bakalov's request would have been fruitless.

In assessing Dr. Bakalov's first two requests for self-representation, the trial court applied the wrong legal standard. Denying these requests demonstrated the paternalistic approach explicitly rejected in *Faretta*. In the first instance, Judge Moffat justified his decision to deny Dr. Bakalov's request for self-representation, stating, "You would be doing yourself a major disservice.... I just can't, in all good conscience, Dr.[,] allow you to represent yourself in this case." Subsequently, Judge Lewis stated that "the court finds the Defendant's best interests would not be served by self-representation." Although both judges' observations express honest concern for Dr. Bakalov, they are insuffi-

cient to justify a denial of the right to self-representation. As this court specifically noted in *Drobel*, it is most likely reversible error to deny a defendant's right to self-representation "on the basis of his best interests." 815 P.2d at 733 n. 16.

 While the first two orders denying Dr. Bakalov's right to self-representation explicitly apply the wrong standard, it is less clear how Judge Lewis reached her final decision denying Dr. Bakalov's motion to represent himself during the trial. Judge Lewis found that Dr. Bakalov could not knowingly and intelligently waive his right to counsel because of deficient knowledge about the United States legal system, language difficulties and other reasons "raised in previous motions in connection with self-representation." [5] Although the court did not specify which additional information bolstered the decision to deny Dr. Bakalov's motion, the State directs us to a letter addressed to Dr. Bakalov's attorneys from Dr. Michael DeCaria, a clinical psychologist, discussing his examination of Dr. Bakalov and stating that Dr. Bakalov had a narcissistic personality disorder, causing him to believe in the absolute accuracy of his own perceptions. The difficulty facing us on appeal, however, is that none of the factors specifically mentioned by the court directly relate to whether Dr. Bakalov intelligently and knowingly chose to proceed without the assistance of counsel. Furthermore, we cannot ascertain from the court's findings if or to what extent the letter or any other information was relied on by the court. Finally, we note that the court prefaced its order to go forward with assigned counsel by stating that the decision was "to protect [defendant's] interests."

 The record does not demonstrate that Dr. Bakalov's language deficiency was sufficient to preclude an intelligent and knowing election of self-representation.

---

5. In her earlier order, Judge Lewis also noted that Dr. Bakalov would have difficulty in preparing for trial while he was in jail. However, so long as a defendant is made aware of and understands such impediments, it does not support a finding that the request is not knowing and intelligent. A choice of self-representation is almost inevitably disadvantageous, including the reality of limited legal research and resources if the defendant is incarcerated. *Drobel*, 815 P.2d at 736–37.

Although the court appointed a translator, the record indicates that Dr. Bakalov was able to understand much of what was happening without translator assistance. According to the record, the translator stopped translating on several occasions because Dr. Bakalov understood what was being said, and on several occasions Dr. Bakalov actually corrected the translator.

Dr. Bakalov's lack of knowledge about the American judicial system is, likewise, not an appropriate standard by which to negate a knowing and intelligent decision to be tried pro se. As the Supreme Court noted in *Faretta,* a defendant's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541.

Although the court ultimately found that Dr. Bakalov "would not be able to knowingly and intelligently waive his right to counsel," the underlying factual findings indicate that the court reached this conclusion through an approach analogous to the paternalistic best interest standard. The record is devoid of specific findings which relate to whether Dr. Bakalov's choice to represent himself was intelligent and knowing.[6]

Our review is further hindered because the trial court did not conduct a colloquy with Dr. Bakalov informing him of the potential consequences of his decision. It is the trial court's duty to determine whether the defendant does in fact understand the rights being waived and the potential consequences. *See State v. Lafferty,* 749 P.2d 1239, 1248 (Utah 1988) (appropriately finding an insufficient basis for a knowing and intelligent choice of self-representation when defendant responded to trial court's questions about his request with "no comment"), *aff'd on reh'g,* 776 P.2d 631 (Utah 1989). If the defendant demonstrates that he understands the consequences and still desires self-representation, there would be little to justify denial of such a request.[7]

This case, however, exhibits very little direct dialogue between the court and Dr. Bakalov. The various motions for self-representation were either in writing from Dr. Bakalov, or through his appointed counsel. In the face of Dr. Bakalov's insistence that he understood the consequences of self-representation, this lack of personal discussion becomes critical.

The practical effect of denying Dr. Bakalov's request for self-representation was to further exacerbate the very fears which compelled him to seek self-representation. Dr. Bakalov believed that his defense attorneys worked for the State and that they were attempting to have him deported. The court's refusal to allow him to dismiss his attorneys must have confirmed those suspicions. As the Court noted in *Faretta:* "To force a lawyer on a defendant can only lead him to believe that the law contrives against him." *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540. When a defendant believes that the court appointed attorney's job is to help obtain a conviction, he or she is unlikely to cooperate with the attorney. In fact, because Dr. Bakalov believed his attorneys were not looking out for his best interests, he refused to cooperate fully with them. Dr. DeCaria's letter to counsel advised that Dr. Bakalov "would rather speak to the Court and to the jury for himself. Further, because he does not trust you, he will withhold information from you or any other attorneys appointed for him. He is not capable of assisting in his defense." This attitude on Dr. Bakalov's part would necessarily hamper the efforts of his attorneys. As predicted in *Faretta,* Dr. Bakalov's beliefs and actions denied him true representation. *Id.* at 834, 95 S.Ct. at 2540–41.

---

**6.** We note the possible inconsistency of the court's finding that Dr. Bakalov was able to knowingly and intelligently waive his right to a jury trial, yet was not able to knowingly and intelligently choose self-representation.

**7.** In *Faretta,* the Supreme Court recognized that there are some defendants who would misuse the right of self-representation. *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46. In such a case, the court would be justified in terminating the self-representation. *Id.*

Undoubtedly, situations will arise where the trial court finds that although the choice of self-representation is "knowing and intelligent," it harbors serious reservations about the ability of defendants to effectively represent themselves. In such a case, the court may "appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46. This approach preserves the defendant's right to self-representation while insuring that the defendant cannot later appeal, claiming that he or she did not knowingly and intelligently waive the right to counsel or that he or she received ineffective assistance of counsel. Once a defendant has exercised the right to proceed without counsel, appellate courts will hold defendants to the consequences of that decision in most instances.[8]

Given the deficiencies in the trial court proceedings and orders, the author of this opinion would reverse and remand for a new trial. Remand for reconsideration, as suggested in Judge Orme's concurring opinion, appears inappropriate.[9] The circumstances existing prior to Dr. Bakalov's trial cannot be recreated, thus forcing Judge Lewis on remand to rely on the record and her recollections. This is particularly problematic because the trial court never advised Dr. Bakalov of the dangers and disadvantages of self-representation and thus could not then or now assess his responses to that advice. Nonetheless, remand is more palatable than the affirmance favored by Judge Jackson. Accordingly, the author reluctantly agrees to the remand preferred by Judge Orme and instructions pertaining thereto.

**CONCLUSION**

Dr. Bakalov has a constitutional right to represent himself if he voluntarily and intelligently chose to do so. In deciding whether Dr. Bakalov could exercise that right, the trial court erroneously considered Dr. Bakalov's best interests and his technical ability to manage his own defense. Further, the court's determination that Dr. Bakalov could not knowingly and intelligently choose self-representation is not supported either by the underlying fact findings cited by the court or by any colloquy or other meaningful inquiry into Dr. Bakalov's ability to understand the risks of self-representation. Finally, we are unable to ascertain what further evidence in the record the court may have relied upon. Therefore, we remand for further proceedings consistent with this opinion and with the instructions contained in Judge Orme's concurring opinion.

ORME, Judge (concurring):

I concur in the careful and complete discussion of the law applicable to the right of self-representation set forth in the main opinion. I disagree with Judge Greenwood only insofar as she would order a new trial at this juncture. I believe remand for further consideration by the trial court is in order. Given Judge Greenwood's preference for this disposition over the affirmance urged by Judge Jackson, such a remand is the order of this court.

I confess that I view defendant's appeal with considerable skepticism. While I am perhaps guilty of the same paternalism which infected the trial court, it is clear to me that defendant was in better hands with appointed counsel than if he had set about to defend himself, the proverbial stranger in a strange land—all the more so because his defense of choice promised to focus on a bizarre, paranoid theory of conspiracy

---

**8.** In *Faretta,* the Supreme Court noted, "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46.

**9.** Judge Orme also speculates that Dr. Bakalov's motions for self-representation were merely part of a calculated strategy for obtaining reversal on appeal. The author does not share that suspicion, and indeed finds it inconsistent with Dr. Bakalov's understanding and distrust of the American legal system.

rather than anything pertinent to the substantive charges he faced.

But of more concern to me is the posture in which defendant's claim comes to us. He proceeded to trial with his self-representation issue still lurking, and thus with a "ready issue for appeal if the result at trial prove[d] displeasing." *West Valley City v. Majestic Inv. Co.,* 818 P.2d 1311, 1314 n. 2 (Utah App.1991). Such a "two bites at the apple" strategy is not favored. *See, e.g., id.; State v. Morgan,* 813 P.2d 1207, 1211 (Utah App.1991). I believe if defendant was seriously concerned about the trial court's precluding him from representing himself, he would have said so in a petition for interlocutory appeal or for writ of mandamus. To instead see how his trial came out before raising his concern with the appellate court smacks of opportunism—opportunism which works a particular hardship on the victim in this case, who may well be required to endure a second trial even though defendant will have even less hope of acquittal handling his own defense than he had when his defense was entrusted to competent counsel.[1]

All of that having been said, defendant has, as a technical matter, preserved the issue for appeal.[2] I agree that on the first two occasions when the trial court denied defendant's motion the incorrect legal standard was used. On the third occasion, the correct legal standard was articulated, but the court's findings are inadequate to establish that the standard of a knowing and intelligent waiver of the right to counsel was not satisfied. Given the concerns I have expressed in the preceding paragraph, together with the established practice of

giving a trial court whose findings are inadequate the opportunity to more fully enlighten us, I would not order a new trial other than as a last resort. On the contrary, I would remand with instructions to the trial court to reconsider its decision in light of this court's opinion. If upon doing so the trial court concludes it erred, it can grant a new trial.[3] If it believes its decision was sound, then it should have the opportunity to enter more complete and detailed findings in support of that decision. With the benefit of those findings, we can then decide whether the trial court acted correctly. Without such findings, I am not prepared to say a new trial is necessary.

JACKSON, Judge (dissenting):

I respectfully dissent from the majority decision to remand this case to the trial court for further findings. The right to assistance of counsel is "personal in nature and may be waived by a competent accused if the waiver is 'knowingly and intelligently' made." *State v. Frampton,* 737 P.2d 183, 187 (Utah 1987) (citations omitted). It follows that an accused's "decision to defend himself is a waiver of the right to assistance of counsel." *Id.* The trial court determines whether this waiver is "knowingly and intelligently" made. *Id.*

Appellate review of a trial court's determination can be made by examining the record. *See id.* at 188 (even absent a colloquy appellate court will look at any evidence in the record showing awareness of the risks of proceeding pro se); *State v. Hamilton,* 732 P.2d 505, 507 (Utah 1986)

---

1. Contrary to the characterization of my concern in note 9 of the main opinion, I am not suspicious about defendant's initial motive in moving the trial court for permission to proceed without counsel. I have no reason to doubt the sincerity of his position. I question only his motive, having lost those motions, in not seeking the pretrial assistance of this court in securing his proclaimed objective. He could have petitioned for leave to file an interlocutory appeal. He could have petitioned for leave to file an interlocutory appeal. He could have sought a writ of mandamus. He did neither. I am concerned that, on the advice of zealous counsel, he seized upon the opportunity to proceed to trial with the assistance of counsel saving this

argument, and the prospect of reversal of any conviction and a new trial, for appeal.

2. This case suggests that consideration should be given to amending the pertinent rules and statutes to require that any appeal from the denial of a motion for self-representation be taken immediately or be foreclosed.

3. Of course, defendant would not get a second trial with counsel's assistance. Any grant of a new trial should be conditioned on defendant representing himself. In any such new trial, his prior waiver of the right to a jury trial stands.

(per curiam) ("record evidence supports the ruling of the trial court and the review of the district court that defendant waived his right to assistance of counsel"); *State v. Dominguez*, 564 P.2d 768, 770 (Utah 1977) ("[a] review of the transcript ... shows defendant was fully advised of his right to counsel and of the dangers and disadvantages of proceeding without the aid of an attorney"); *State v. Drobel*, 815 P.2d 724, 733 (Utah App.1991) (record reflects that trial court considered critical facts in self-representation determination). Because the record in this case clearly supports the trial court's ruling that defendant's waiver of counsel and decision to represent himself was not knowingly and intelligently made, there is no need to remand for further findings and the trial court's ruling must be affirmed.

A decision to waive counsel is knowingly and intelligently made if the defendant is aware of the dangers and disadvantages of self-representation. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *Frampton*, 737 P.2d at 187; *Hamilton*, 732 P.2d at 507; *Dominguez*, 564 P.2d at 769. The record must show that defendant "knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541; accord *Frampton*, 737 P.2d at 187; *Hamilton*, 732 P.2d at 507; *Dominguez*, 564 P.2d at 769. When reviewing the record, this court must consider "the total circumstances of the individual case including background, experience and the conduct of the accused." *Drobel*, 815 P.2d at 733 (quoting *United States v. Padilla*, 819 F.2d 952, 958 (10th Cir.1987)).

The main opinion sets forth certain facts from the record that are relied upon to conclude the defendant made a "knowing and intelligent" waiver of his right to counsel. However, the record contains additional material facts, set forth below, which need to be included in the analysis. My review of the defendant's background, experience and conduct in this record convinces me that the defendant could not knowingly and intelligently waive his right to counsel. His requests to waive his right were based on a complete misunderstand-

ing of and distrust of the American legal system, in tandem with a narcissistic personality disorder. Accordingly, the defendant could not understand the dangers and disadvantages of self-representation and did not know what he was doing.

In *Drobel*, this court noted that "competence to stand trial, by itself, 'does not automatically enable an accused to waive the constitutional right to assistance of counsel and to conduct his or her own defense.'" *Drobel*, 815 P.2d at 734 (quoting *State v. Lafferty*, 749 P.2d 1239, 1248 (Utah 1988)). However, an "expert's assessments of ... competence to stand trial are also relevant to the question of whether [one is] able to knowingly and intelligently choose to represent himself." *Drobel*, 815 P.2d at 734. The trial judge referred the question of the defendant's competence to stand trial to Dr. Michael D. DeCaria, a clinical psychologist. In a June 6, 1991 evaluation report, Dr. DeCaria concluded that after several sessions with the defendant:

Dr. Bakalov has virtually no understanding of the American legal system. In spite of my patient and repeated explanations to him, he was unable to attach even rudimentary meaning to such terms as preliminary hearing, pretrial motion, Circuit Court, District Court, burden of proof, beyond a reasonable doubt, presumption of innocence, jury selection, a jury of his peers, and trial.

Dr. DeCaria also testified of these conclusions in court. At the July 9, 1991 hearing, Dr. Bakalov stated, in answer to the trial court's exhaustive questioning of his reasons for wanting to waive his right to a jury trial, that "[i]t's much more easy for me to convince one person than try to convince eight people." Clearly Dr. Bakalov did not understand even the basic tenet of American Jurisprudence, that one is innocent until proven guilty. Moreover, his response shows that he did not understand the requirement of a "unanimous" verdict. He did not understand that he would only need to raise a reasonable doubt in the mind of one of eight jurors to successfully defend against the charges. Accordingly,

he did not understand the dangers and disadvantages of self-representation.

The record shows defendant's complete lack of trust in the American judicial system. In a May 21, 1991 letter to Judge Lewis, he stated: "I wish to represent myself and to reduce the risk of intentional inaccuracies [sic] and omission of evidence." He further stated regarding his defense counsel, "I have seriously suspicious that they are no independent and work under the direction of ... my ... sponsor.... [H]e is doing his utmost to retain me in custody and/or to extradite me to the U.S.S.R. or Bulgaria." The defendant believed the public defenders benefit if their clients receive "small sentences." Further, he thought that juries are functionaries of the state. Finally, he believed there was an overall conspiracy in the judicial system to convict him. Having three fundamental misdirected beliefs concerning our system, he wanted to "go it alone."

Dr. DeCaria's evaluation and corresponding testimony stated further:

> [I]t is reasonable to conclude that Dr. Bakalov's behavior can be interpreted as the reaction of a Bulgarian citizen so steeped in the isolation and national consciousness of Bulgarian politics that he is unable to accurately perceive the process of the American judicial system. In other words, he can only make sense of the American judicial system based on his experiences in Bulgaria, and he lacks the requisite experience and education to see how American justice is different from Bulgaria's.

In the defendant's mind there were no advantages to assistance of counsel. Thus, he could not understand the disadvantages of self-representation.

Not only did the defendant misunderstand and distrust the legal system, but he suffered from a personality disorder that made it difficult for him to view his misperceptions in any other way. Dr. DeCaria stated that the defendant's "behavior can be described as narcissistic personality disorder. He believes in the absolute accuracy of his own perceptions...."

After reviewing Dr. Bakalov's background, experience, and conduct, it is clear that he does not even recognize the dangers and disadvantages of self-representation, let alone understand them. His waiver of counsel was not made with "eyes open," but with eyes clouded by the misunderstanding and distrust developed over many years of living in a communist culture. The record demonstrates that the defendant did not know what he was doing when he requested that his right to counsel be waived. Accordingly, I would affirm the trial judge's decision to provide assistance of counsel and not accept his waiver.